## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## ANDERSON DIVISION

| | | |
|---|---|---|
| William Anthony, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 8:09-cv-02383-JMC |
| | ) | |
| v. | ) | |
| | ) | |
| The Atlantic Group, Inc. d/b/a DZ Atlantic, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |
| | | |
| Charles Adams, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 8:09-cv-02942-JMC |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| The Atlantic Group, Inc. d/b/a DZ Atlantic, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

Plaintiffs in these cases are former employees of Defendant The Atlantic Group, Inc., doing business as DZ Atlantic ("DZ Atlantic").[1]  DZ Atlantic employed Plaintiffs as temporary, seasonal, and contract workers at nuclear power facilities in South Carolina and North Carolina owned by Duke Energy Carolinas, LLC ("Duke").  DZ Atlantic terminated Plaintiffs' employment after concluding Plaintiffs provided inaccurate information regarding their

---

[1] These cases were commenced in two separate lawsuits filed on September 9, 2009, and November 11, 2009, originally consisting of sixty (60) total plaintiffs, of which forty-nine (49) currently remain.  The cases are not formally consolidated, but the parties and the court have handled most pre-trial matters, including DZ Atlantic's instant motion, on a consolidated basis due to the related nature of the cases.  Additionally, the parties have filed identical versions of the motion and the related documents relevant to this order in the dockets of both case numbers.  For convenience, the court will only cite to these documents as filed in the *Anthony* litigation, C.A. No. 8:09-cv-02383-JMC, unless otherwise noted.

permanent residences on per diem eligibility forms submitted to DZ Atlantic.  DZ Atlantic reported Plaintiffs' terminations to Duke, and as a result, Plaintiffs lost their unescorted access authorization for nuclear facilities around the country – a penalty that lasts for at least three years and prevents Plaintiffs from applying their trade in the nuclear industry.  Plaintiffs allege that the circumstances surrounding their terminations were wrongful, negligent and fraudulent. Plaintiffs seek actual, consequential, and punitive damages for their claims.  Additionally, Plaintiffs seek equitable relief in the form of rescission of their termination and/or modification of the reason for their termination.

DZ Atlantic argues that Plaintiffs' action against it, although creatively labeled, amounts to nothing more than a wrongful termination claim and that Plaintiffs' primary complaint against DZ Atlantic stems from DZ Atlantic's classification of Plaintiffs' terminations and subsequent reporting of those classifications to Duke.  Without making any concessions, DZ Atlantic contends that its conduct in reporting Plaintiffs' terminations to Duke, if at all actionable, is more in the nature of a claim for defamation and does not arise under the claims presently asserted by Plaintiffs.[2]  Instead, DZ Atlantic contends that it has been victimized by Plaintiffs' wrongful receipt of per diem payments, which Plaintiffs must refund.   Accordingly, DZ Atlantic counterclaimed against Plaintiffs, alleging causes of action for unjust enrichment, conversion, promissory estoppel, fraud, intentional misrepresentation, breach of duty of loyalty, and civil conspiracy.  Currently before the court is Defendant's Motion for Summary Judgment in both cases. [Dkt. No. 228 in 8:09-cv-02383-JMC] pursuant to Rule 56 of the Federal Rules of Civil

---

[2] Plaintiffs' Third Amended Complaint [Dkt. No. 40 in 8:09-cv-02383-JMC; Dkt. No. 18 in 8:09-cv-02942-JMC] previously included a claim against DZ Atlantic for defamation.  However, the parties entered a joint stipulation [Dkt. No. 135 in 8:09-cv-02383-JMC; Dkt. No. 79 in 8:09-cv-02942-JMC] to dismiss the claim with prejudice earlier in this litigation.  The court does not make any assessment of the propriety of Plaintiffs' now dismissed defamation claim.

Procedure and the Local Rules of this court.  For the reasons set forth below, this court denies in part and grants in part DZ Atlantic's motion.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

DZ Atlantic is in the business of supplying maintenance services for the fossil fuel and nuclear power industry.  Specifically, it supplies temporary, seasonal and contract trades people to staff power stations across the country.  Plaintiffs were employed for various temporary work assignments at the Catawba Nuclear Station in York County, South Carolina, the Oconee Nuclear Station in Oconee County, South Carolina, and the McGuire Nuclear Station in Mecklenburg County, North Carolina, all of which are operated by Duke.

As employees of DZ Atlantic, Plaintiffs were subject to the safety regulations and work rules as described in the Employee Handbook[4] given to all employees.  [Dkt. No. 228-3]. Plaintiffs were required to sign acknowledgments that they had received and read the handbook with the understanding that they were expected to be familiar with the policies and procedures described within it.  Plaintiffs were also subject to unescorted access authorization programs ("UAA programs"), which are a component of a larger safety regime mandated by federal regulations and for which guidelines were written and promulgated by the Nuclear Energy

---

[3] The court acknowledges Plaintiffs' objection to DZ Atlantic's Supplemental Local Rule 26.03 Responses and, particularly, three related exhibits appended to the Motion for Summary Judgment.  *See* [Dkt Nos. 257-6, 258-4, and 253].  For purposes of this order, the court did not reference these exhibits.  Accordingly, the court need not resolve Plaintiffs' objection at this time.

[4] The DZ Atlantic Safety and Employee Handbook consists of two sections: one entitled "Safety Manual" and the other entitled "Employee Handbook."  These two documents appear to be bound together and were submitted as one exhibit, although each document maintains its own individual pagination. Presumably, these documents are provided to employees at the same time. Plaintiffs sometimes cite to content in the Safety Manual while referring to this as part of the Employee Handbook.  The court will also refer to the entire document as the Employee Handbook without differentiating parts.

Institute (NEI), a private consortium of nuclear power operators around the country.  These programs facilitate the investigation of employees whose jobs require unescorted access to sensitive nuclear facilities to minimize security risks.  For this reason, nuclear power plant licensees (here, Duke) and/or the vendors (here, DZ Atlantic) providing contractors are required to conduct background investigations of employees given unescorted access authorization to nuclear facilities.  DZ Atlantic disclosed this requirement to all employees in the Employee Handbook and also disclosed it in a separate consent document, signed by the employees during the hiring process, which authorized DZ Atlantic to share with its clients any information relevant to those employees granted unescorted access authorization. Further, DZ Atlantic was required to report to Duke the circumstances under which any employee was unfavorably terminated, and Duke had the authority to determine whether the unfavorable termination would impact that employee's unescorted access authorization. *See infra* note 11.

As temporary, seasonal, and contract trade workers, some of DZ Atlantic employees did not reside in the area where they were assigned to work.  For these non-local employees, DZ Atlantic offered a non-taxable per diem allowance to defray the costs of duplicate living expenses.[5]  To qualify for the per diem program, employees were required to complete and sign a Certificate of Per Diem Eligibility ("Certificate"). [Dkt. No. 272-1, at 85-91].  The Certificate explained that eligibility for the per diem program was "contingent upon maintenance of a permanent residence 50 miles or more away from [the employee's assigned work] site and

_____

[5] In its Motion for Summary Judgment, DZ Atlantic asserts that the per diem program was governed by rules set out in Internal Revenue Service ("IRS") Publication 1542 and IRS Publication 463.  The first Certificate of Per Diem Eligibility in effect during the relevant time periods covered by this litigation did not mention any IRS regulations. Later iterations of the Certificate included the following sentence:  "I understand that non-taxable and taxable per diem eligibility is governed by IRS regulations and will be administered by DZ Atlantic accordingly." [Dkt. No. 272-1, at 85-91].  However, no specific IRS regulations are listed.

4

maintaining a separate residence while employed." *Id.* As proof of their permanent address, employees also had to provide at least two of the following pieces of documentation: a valid driver's license, a mortgage document, a current voter registration, or a current utility bill.[6] *Id.* By signing the Certificate, the employee certified that the information provided in the Certificate was "true and accurate." *Id.* The signer also agreed to "reimburse to DZ Atlantic any money that has been wrongfully paid for per diem and . . . that DZ Atlantic has the right to use all legal means to recoup these monies." *Id.* The form also required a DZ Atlantic representative to sign and date the Certificate "attest[ing] to having viewed the appropriate original documentation." *Id.*[7]

On or about March 2009, Duke began receiving anonymous calls to its ethics hotline claiming that some of DZ Atlantic employees were wrongfully receiving per diem compensation. Given the volume of the calls to Duke's hotline, DZ Atlantic began an investigation into all of its employees who received per diem payments.[8] In the initial investigation, DZ Atlantic compared the addresses listed by the employees on their employment documents with addresses provided by an online information service. DZ Atlantic concluded that 209 employees should be

---

[6] The format of the Certificate of Per Diem Eligibility changed over time. Versions used through 2003 required two of four types of documentation listed above. Current city tax receipts and current vehicle registrations were later added to the list of possible documents that were acceptable as proof of permanent residence. Furthermore, the submission of proof of mortgage or rental documents became mandatory, in addition to submitting at least two other types of information. Also, employees were later required to provide documentation that they maintained a separate address.

[7] Some Plaintiffs testified that they believed a DZ Atlantic representative's signature served as authorization for Plaintiffs to receive per diem compensation.

[8] DZ Atlantic conducted at least two investigations concerning employee receipt of per diem payments in the decade prior to the investigation at issue in this case, which began in 2009. In previous investigations, ineligible employees were simply denied further per diem eligibility; they were not terminated or made to repay the funds.

interviewed in person about discrepancies in their residence information.  DZ Atlantic ultimately terminated 145 employees whom it believed had not been truthful and accurate in their documentation or who had refused to cooperate with the investigation.[9]  When these employees were fired, DZ Atlantic listed the reason for their termination as "falsification of documents."  Because these firings were considered unfavorable terminations, DZ Atlantic acted pursuant to its interpretation of the UAA program and federal regulations,[10] and it provided this information to Duke.[11]  Shortly thereafter, Duke revoked Plaintiffs' unescorted access authorization, and it informed Plaintiffs of its decision by letter.

Plaintiffs note that at or around the same time that DZ Atlantic was beginning its investigations, Duke was implementing a Local Supplemental Workforce Program, in which Duke expressed its preference for hiring local workers in an attempt to both control its costs and contribute to the local economy.  *See* Ron Jones Memorandum [Dkt. No. 40-17].  The new policy stated that workers who declared themselves "local" (that is, living within 50 miles of an

---

[9]  Following the interviews, DZ Atlantic asked some employees to provide additional documentation within 48 hours to support their information claimed on their Certificates of Per Diem Eligibility.  The investigators provided the employees with a list of acceptable additional documents that could help prove their eligibility for per diem compensation. [Dkt. No. 40-11].  Although some of the employees attempted to provide the requested additional documentation, others considered the results of the investigation a foregone conclusion and decided not to participate at all.

[10] *See generally* 10 C.F.R. § 73.56

[11]  The NEI guidelines make clear that Duke, not DZ Atlantic, is responsible for granting, denying, or terminating an individual's unescorted access authorization.  *See* NEI 03-01 Rev 3 § 2.d.  Further, NEI 03-01 Rev 3 § 6.1 requires that "the organization responsible for controlling access  . . . must be notified prior to or simultaneous with [an employee's] unfavorable termination."  Nuclear Power Plant Access Authorization Program [Dkt. No. 196 at 14].  Additionally, NEI 03-01 Rev 3 § 10.4 requires that appropriate officials, in this case, officials at Duke, review the facts involved in any unfavorable termination or resignation-in-lieu-of termination of nuclear power operator or contractor employees holding unescorted access status.  *Id.* [Dkt. No. 196-2 at 64]. *See also* McConnell Deposition at 155-156 [Dkt. No. 272 at 62].

employee's work site) would be favored for more permanent employment with Duke.  *Id.*  DZ Atlantic supervisors informed their employees about the preference for local workers and many workers decided to declare themselves "local" to obtain a permanent job with Duke.  Plaintiffs contend that DZ Atlantic supervisors also encouraged its employees to no longer claim their per diem status if they wanted to continue working with Duke.  Plaintiffs further claim that those Plaintiffs who dropped their per diem eligibility and declared themselves local were among the first people to be investigated for unauthorized receipt of per diem payments.  This is an element in Plaintiffs' larger narrative that DZ Atlantic employees cost Duke too much money in per diem payments, and that DZ Atlantic actively sought to reduce the number of people receiving per diem compensation, despite having encouraged these employees to receive the alleged illicit per diem payments.

Sixty (60) of the terminated workers, of which forty-nine (49) remain, brought the present action against DZ Atlantic.[12]  In their amended complaints, Plaintiffs allege the following causes of action: breach of contract/wrongful termination; breach of contract accompanied by a fraudulent act; promissory estoppel; negligence and/or gross negligence; negligent or intentional misrepresentation; and fraud in the inducement.   DZ Atlantic filed several counterclaims against all Plaintiffs but seek summary judgment only as to its claims for unjust enrichment, conversion and promissory estoppel against thirty-three (33) Plaintiffs who it claims have admitted to falsification of their permanent residence information or who have no credible explanation for their permanent residence information provided in the Certificates of Per Diem Eligibility.[13]  DZ

---

[12] Although Plaintiffs seek reinstatement of their unescorted access authorization, Plaintiffs have not brought any action against Duke, the entity which may be capable of granting that relief.

[13]  In this group of Plaintiffs, DZ Atlantic includes Anthony, Chappell, Dickert, Ernandez, Ertzberger, G. Evatt, R. Evatt,  Evett, Iseli, Kelly, B. McGuffin, K. McGuffin, Oliver, Parham,

Atlantic now moves for summary judgment on all of Plaintiffs' claims and its counterclaims against the specific Plaintiffs.

## LEGAL STANDARD

**Summary Judgment**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *See id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing

---

Price, Prince, Rhodes, Smith, Spoone, Suttles, Trevino, and Winchester from the *Anthony* litigation. DZ Atlantic includes Adams, Byers, Clary, Ford, Fuller, Harris, Lanning, Mayfield, Moore, Reese and Robinson from the *Adams* litigation.

law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### Breach of Contract/Wrongful Termination

DZ Atlantic contends that it is entitled to summary judgment on Plaintiffs' claims for wrongful termination and breach of contract as a matter of law because Plaintiffs were at-will employees who were subject to termination with or without cause.  DZ Atlantic maintains that all of its employees were at-will and could be terminated at any time and for any reason.  The Employee Handbook explicitly states that employment with DZ Atlantic is at-will and indeed, many Plaintiffs admitted in their depositions that they understood their employment to be at-will.[14]  However, Plaintiffs now claim that DZ Atlantic made binding promises in the Employee Handbook,[15] the employment application,[16] and the Certificate of Per Diem Eligibility that created implied contract rights effectively preventing DZ Atlantic from terminating employees for reasons related to per diem ineligibility.  Specifically, Plaintiffs argue that because the Certificate required ineligible Plaintiffs to repay any money wrongfully acquired, DZ Atlantic

---

[14] Where "it is uncontroverted that Plaintiff possessed actual knowledge regarding the language specifically providing that the handbook does not change the at-will employment relationship, Plaintiff cannot  . . . credibly argue that the employee handbook constitutes a contract of employment." *Westmoreland v. AB Beverage Co., Inc.*, 1:05-3475-MBS, 2007 WL 2749450, at *5 (D.S.C. Sept. 20, 2007) (citing *Horton v. Darby Elec. Co.,* 360 S.C. 58, 599 S.E.2d 456, 460-61 (2004)).  A number of Plaintiffs here admit in their depositions that they were at-will employees and that the handbook stated as much.  However, in this case, Plaintiffs allege that a subsequent document – the Certificate of Per Diem Eligibility – may have altered their at-will status.  Therefore, it remains necessary to reach the legal issue as to whether an employment contract was created by the Certificate of Per Diem Eligibility.

[16] Plaintiffs mention the employment application but fail to cite to any specific language in the employment application that establishes promissory language in support of their contractual argument.  Moreover, DZ Atlantic notes that the application is mentioned for the first time in Plaintiffs' Response memorandum, such that it is prejudicial.  For these reasons, the court does not address the employment application.

somehow limited its ability to terminate employees who had wrongfully received per diem compensation.  In this case, Plaintiffs' claims for wrongful termination due to breach of contract depend upon whether a contract was created between DZ Atlantic and Plaintiffs that altered the at-will nature of the employment relationship.  Similarly, Plaintiffs' claims for breach of contract accompanied by a fraudulent act survive only if the court finds that a contract exists.

South Carolina has long recognized the doctrine of at-will employment in which either an employer or employee can sever their relationship "'for any reason or no reason'" without the severing party being liable to the other for breach of contract.  *Lord v. Kimberly-Clark Corp.*, 827 F. Supp. 2d 598, 602 (D.S.C. 2011) (citing *Grant v. Mount Vernon Mills, Inc.,* 370 S.C. 138, 634 S.E.2d 15, 19 (Ct. App. 2006)).  However, the South Carolina Supreme Court has recognized that an employee handbook can alter the at-will status of an employee.  *Small v. Springs Indus., Inc.*, 292 S.C. 481, 486, 357 S.E.2d 452, 455 (1987).  Thus, when a handbook alters the employee's at-will status, an employee discharged without cause or not in accord with specific procedures laid out in the handbook may have a cause of action for wrongful discharge.  *Conner v. City of Forest Acres,* 348 S.C. 454, 464, 560 S.E.2d 606, 610 (2002).  The South Carolina Supreme Court identified the public policy supporting this exception to the at-will employment doctrine noting that it would be "patently unjust to allow an employer to couch a handbook, bulletin, or other similar material in mandatory terms and then allow him to ignore these very policies as 'a gratuitous, nonbinding statement of general policy' whenever it works to his disadvantage."  *Small,* 292 S.C. at 485, 357 S.E.2d at 455 (finding wrongful termination where an employee was terminated after only one warning in violation of an employee handbook which set forth a four step disciplinary procedure).  *See also Greene v. Quest Diagnostics Clinical Laboratories, Inc.*, 455 F. Supp. 2d 483, 491 (D.S.C. 2006).

Employee handbooks and other distributed policy documents do not automatically alter the at-will status of the employee. Pursuant to South Carolina law "a handbook, personnel manual, policy procedure or other document, issued by an employer or its agent after June 30, 2004, shall not create an express or implied contract if it is conspicuously disclaimed." S.C. Code Ann. § 41-1-110 (2012). The requirements for a conspicuous disclaimer are explicitly stated in the statute: "a disclaimer in a handbook or personnel manual must be in underlined capital letters on the first page of the document and signed by the employee. For all other documents referenced in this section, the disclaimer must be in underlined capital letters on the first page of the document." *Id.*

However, an employee's at-will status may not be altered simply by demonstrating the absence of a conspicuous disclaimer and an employee signature in a handbook; the handbook must also include enforceable promises stated in mandatory language. *See Grant,* 370 S.C. at 150, 634 S.E.2d at 22 ("[B]ecause nothing in the employee handbook outlined progressive disciplinary procedures in mandatory terms, the presumption that the employment was at-will was not rebutted and no disclaimer was needed. Accordingly, we hold the handbook did not contain promises enforceable in contract.").[17] To qualify as mandatory language sufficient to establish an implied contract for employment, the policy manual language "must be definitive in nature, promising specific treatment in specific situations." *Hessenthaler v. Tri-Cnty. Sister Help, Inc.,* 365 S.C. 101, 110, 616 S.E.2d 694, 698 (2005). Furthermore, in wrongful termination cases, the promises in the handbook or other document "must restrict the right of an

---

[17] This court recently addressed the impact of an employee handbook on the status of at-will employment in *Tompkins v. Eckerd*, CA 8:09-CV-02369-JMC, 2011 WL 4549173 (D.S.C. Sept. 30, 2011), *reconsideration denied*, 8:09-CV-02369-JMC, 2012 WL 1099770 (D.S.C. Mar. 30, 2012).

employer to discharge." *Lawrence v. Westinghouse Savannah River Co., Inc.,* C.A. 1:03-484-27, 2005 WL 3968031, at *4 (D.S.C. March 31, 2005).  Such restrictions typically emerge when employers include mandatory procedures related to progressive discipline and discharge.  *See e.g., Conner*, 348 S.C. at 464, 560 S.E.2d at 611; *Hessenthaler,* 365 S.C. at 109, 616 S.E.2d at 698 ("When definite and mandatory, [progressive discipline] procedures impose a limitation on the employer's right to terminate an employee at any time, for any reason.").

A "court should intervene to resolve the handbook issue as a matter of law . . . if the handbook statements and disclaimer, taken together, establish beyond any doubt that an enforceable promise does or does not exist."  *Hessenthaler,* 365 S.C. at 108, 616 S.E.2d at 697 (quoting *Fleming v. Borden, Inc.,* 316 S.C. 452, 464, 450 S.E.2d 589, 596 (1994)) (internal citations and quotation marks omitted) (alterations in original).  Judgment as a matter of law is likely not appropriate "when there is no disclaimer or when the language is mandatory rather than permissive." *Greene,* 455 F. Supp. 2d at 491.

This case involves both a handbook and a separate, supplemental document.  In such cases, courts have found it necessary to analyze both documents for a conspicuous disclaimer and promissory language related to discipline or termination.  *See Green*, 455 F. Supp. 2d at 492 (finding that an employee handbook did not alter the employee's at-will status because it contained a conspicuous disclaimer and permissive language but finding a jury question existed as to whether a supplemental policy document issued to employees altered the at-will status because it included no disclaimer but did include its own progressive discipline policy); *Tompkins,* 2011 WL 4549173, at *6,  *reconsideration denied,* 8:09-CV-02369-JMC, 2012 WL 1099770 (finding that an employee handbook containing no conspicuous disclaimer and no mandatory language within its discipline policy did not alter the at-will employment relationship,

12

but that jury question existed as to whether a supplemental Quality Improvement Program policy document altered the employee's at-will status when it lacked a disclaimer but included a mandatory discipline procedure).

### A.  The DZ Atlantic Employee Handbook[18]

As a matter of law, the court finds that DZ Atlantic's Employee Handbook [Dkt. No. 228-3] does not contain a conspicuous disclaimer as described by Section 41-1-110 of the South Carolina Code of Laws.[19]  The lack of a conspicuous disclaimer does not automatically create a question of fact as to whether the handbook creates an employment contract; there must also be mandatory language creating a binding promise.  *See Grant,* 370 S.C. at 150, 634 S.E.2d at 22. Moreover, the plaintiff must point to specific language that restricts the employer's right to terminate him.  *Lawrence,* 2005 WL 3968031, at *4.

In its response to DZ Atlantic's Motion for Summary Judgment, Plaintiffs direct the court to no language in the Employee Handbook that would limit DZ Atlantic's right to terminate its

---

[18] The Employee Handbook at issue in this case is dated Revised 2006.

[19] However, the handbook does include clear language alerting the employee to the at-will nature of his employment. Clear disclaimer language appears on page 27 of the handbook, stating in part:

> [T]his handbook is not intended to form a contract, so it should not be construed that way.  Consequently, the policies and procedures discussed in this handbook may be modified by us at any time. . . .  [A]s an at-will employee, your employment may be terminated by the Company at any time, for any reason, with or without cause and with or without notice.

[Dkt. No. 228-3, at 47]. Therefore, even if the handbook disclaimer does not meet the requirements for a conspicuous disclaimer as provided for in the South Carolina Code, it nonetheless contains a disclaimer.

employees.[20]    Moreover, the court has found no procedures for discharge or a policy guaranteeing a fair and proper investigation before termination.  The court has identified some portions in the handbook phrased in mandatory language.  For example, "[a]n employee who violates any safety rule, procedure or standard, the provisions of this manual or acts in such a way as to endanger his/her own or another person's safety shall be subject to disciplinary action, up to and including discharge."  [Dkt. No. 228-3, at 7].   In addition, there are other scenarios in which discharge is mentioned:  "An absence of two consecutive days without contacting your supervisor will result in termination."  [Dkt. No. 228-3, at 35]. "Any employee who violates [the company's Email Internet Policy] will be subject to discipline, up to and including discharge." [Dkt. No. 228-3, at 38].  Of specific relevance here is Section II-H under the heading General Terms and Conditions, which states that "[i]mmediate discharge will result if there are serious violations of work rules or safety regulations."  [Dkt. No. 228-3, at 39].  Further, the handbook states "The employee UNDERSTANDS . . . that falsification of [an] application is cause for immediate discharge.  [Dkt. No. 228-3, at 40] (emphasis in original).  Despite the handbook's use of mandatory language in these sections, none limits DZ Atlantic's right to discharge employees for other reasons or requires it to engage in progressive discipline procedures prior to termination.  *See Hessenthaler*, 365 S.C. at 110, 616 S.E.2d at 698 (holding a handbook's non-discrimination policy did not constitute a promise altering the at-will employment relationship,

---

[20] Plaintiffs point to only one phrase from the handbook related to employee discipline or termination: "A refusal to follow the directions of supervisory personnel will be construed as a resignation from the Company and may result in the immediate expulsion from the site and termination of employment with the Company."   Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment [Dkt. No. 267, at 20] (citing to Employee Handbook [Dkt. No. 228-3, at 41]).  The other allegedly mandatory language that Plaintiffs cite from the handbook concerns DZ Atlantic's appointment of competent supervisors.  This language will be discussed in a separate section, but it does not address employee discipline or termination, and therefore is not relevant to the breach of contract claim.

and stating "[t]o be enforceable in contract, general policy statements must be definitive in nature, promising specific treatment in specific situations").

The only language in the handbook specifically addressing per diem eligibility falls under the heading General Terms and Conditions of Employment and contains the following provision:

> Any claim to training pay, travel pay . . . and per diem, *will be forfeited* if any of the following conditions apply: 1) Failure to obtain a security clearance (including a drug screen); 2) Failure to successfully complete training; 3) Falsification of any part of application or security; 4) Failure to report on scheduled start date.

[Dkt. No. 228-3, at 41].  Certainly, the term "will be forfeited" is stated in mandatory terms. However, there is nothing in this passage that restricts DZ Atlantic's right to terminate its employees for the illicit receipt of per diem monies, only that the per diem money will be forfeited.

Because the handbook does not contain sufficient mandatory language restricting DZ Atlantic's right to terminate its employees or even mention  a required termination procedure, the court finds as a matter of law that the Employee Handbook does not create a contract supporting Plaintiffs' wrongful termination claims.[21]  This decision comports with the policy behind the handbook exception to the doctrine of at-will employment – DZ Atlantic has made no promise to its employees regarding discipline or termination that it is now trying to avoid for its own

---

[21] Assuming *arguendo* that the handbook created an employment contract, and assuming further that the contract was breached, the relevant inquiry becomes "whether the employer had a reasonable good faith belief that termination was warranted under any such policies" and "not whether sufficient cause existed for termination under any applicable policies." *Horton v. Darby Elec. Co.,* 360 S.C. 58, 599 S.E.2d 456, 461 (2004).  For this reason, to survive summary judgment, Plaintiffs would have to allege specific facts showing that DZ Atlantic "did not have a reasonable good faith belief that termination was warranted under the various Company policies giving rise to the alleged contract of employment."  *See id.*  In this case, Plaintiffs focus primarily on whether DZ Atlantic had cause to find that Plaintiffs falsified the information on their per diem eligibility forms, rather than on the relevant issue of whether DZ Atlantic had a good faith belief that termination was appropriate under its company policies.

advantage.   The promises made in no way restrict DZ Atlantic's ability to terminate its employees, and therefore, in no way alters the at-will nature of Plaintiffs' employment.

Finally, Plaintiffs argue in their Response [Dkt. No. 267] to Defendant's Motion for Summary Judgment that DZ Atlantic failed to appoint competent supervisors and that failure led to Plaintiffs' firing for falsification of documents and Plaintiffs losing their unescorted access authorization.   Specifically, Plaintiffs point to the following language from the Employee Handbook:

- The employer is responsible for appointing only competent employees to supervise other workers.  Those appointed shall be responsible for the safe work practices of the employees under their supervision.  [Dkt. No. 228-3, at 8].

- Supervisory Personnel or any other person placed in charge of any work will be held accountable for the enforcement of all safety rules and regulations for that project.  [Dkt. No. 228-3, at 9].

- A refusal to follow the directions of supervisory personnel will be construed as resignation from the Company and may result in the immediate expulsion from the site and termination of employment with the company.  [Dkt. No. 228-3, at 42].

Plaintiffs' reference to these sections of the handbook suggest that Plaintiffs are now trying to couch their breach of contract claim in terms of the alleged incompetence of DZ Atlantic's supervisors.  This argument represents a departure from Plaintiffs' complaints, which exclusively alleged that the Employee Handbook contained "unambiguous promises . . . regarding the eligibility requirements for per diems, the forfeiture of per diems, and grounds for discipline and termination."  Third Amended Complaint [Dkt. No. 40, at 83].  Plaintiffs provide no case law suggesting that a defendant's failure to appoint competent supervisors fits within a wrongful termination claim based on breach of contract, and this court has also found no relevant case law in this district supporting such a claim.  To the extent Plaintiffs are merely attempting to establish some binding promises sufficient to establish the existence of an employment contract,

such language does not address the fundamental concern in a wrongful termination by breach of contract claim, which is whether the promises relate to and limit the employer's ability to terminate employees. Moreover, the first of the two statements cited above specifically address safety regulations, not personnel issues such as the eligibility to receive per diem compensation. To the extent the final quoted statement addresses termination, it does so in permissive language ("Refusal to follow the directions of supervisory personnel . . . *may* result in the immediate expulsion from the site and termination of employment with the company.") (emphasis added). For these reasons, the language cited by Plaintiffs does not further their argument that the Employee Handbook created an employment contract.

### B.  The Certificate of Per Diem Eligibility

As the court previously indicated, the Certificate of Per Diem Eligibility does not contain any disclaimer language. It is a one-page document with blank spaces for the employee's residence information and a signature line at the bottom allowing the signatory to certify that the information contained within the Certificate is true and accurate. Therefore, the fundamental issue is whether the Certificate contains any promissory language that limits DZ Atlantic's ability to terminate an employee without cause such that it alters the at-will status of the employment relationship. Plaintiffs rely on the following statement from the Certificate:

> I understand documentation is required to prove a separate residence is being maintained. Without this evidence DZ Atlantic has no choice but to deny my per diem eligibility as of the start date of employment. Additionally, DZ Atlantic is allowed to voluntarily collect any ineligible funds. If I am found to be INELIGIBLE for per diem, I will reimburse to DZ Atlantic any money that has been wrongfully paid for per diem and I realize that DZ Atlantic has the right to use all legal means to recoup these monies.

[Dkt. No. 272-1, at 85-91]. Plaintiffs argue the phrase "I will reimburse" supplies the required mandatory language establishing a promised course of action when an employee is found

ineligible for per diem payments.  Importantly, Plaintiffs suggest that such language limits DZ Atlantic's response to the discovery of the ineligible receipt of per diem compensation by an employee to the recoupment of the funds only, rather than the termination of the employee.  DZ Atlantic argues that Plaintiffs have misconstrued the Certificate's silence on the issue of discipline as "somehow surrendering its ability to terminate its at-will employees at any time, for any reason" and strenuously objects to that interpretation.  *See* Defendant's Memorandum in Support of Summary Judgment [Dkt. No. 263, at 23].  Upon review of the document, the court finds that the Certificate has no language whatsoever related to employee discipline or termination.  It simply requires those employees found ineligible for per diem payments to repay monies wrongfully received.  The Certificate imposes this requirement regardless of whether the employee was terminated or not.  Therefore, Plaintiffs have no legitimate argument that the Certificate has any mandatory or promissory language that alters the at-will status of DZ Atlantic's employees.

Because neither the Employee Handbook nor the Certificate limits DZ Atlantic's ability to terminate its employees or otherwise alters the at-will nature of DZ Atlantic's employees, the court grants DZ Atlantic's Motion for Summary Judgment on Plaintiffs' wrongful termination by breach of contract claim.

**Breach of Contract Accompanied by a Fraudulent Act**

DZ Atlantic seeks summary judgment on Plaintiffs' claims for breach of contract accompanied by a fraudulent act on the ground that Plaintiffs cannot establish the existence of any contract that can be breached.  To establish a breach of contract accompanied by a fraudulent act, a plaintiff must show "1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach."

*Conner*, 348 S.C. at 465-66, 560 S.E.2d at 612.  A fraudulent act is an act "characterized by dishonesty in fact or unfair dealing."  *Id.* at 348 S.C. 466, 560 S.E.2d at 612.

Plaintiffs contend that the Employee Handbook and the Certificate create a contract between DZ Atlantic and its employees that alters their at-will employment status, and further contend that the alleged contract was breached when DZ Atlantic terminated Plaintiffs' employment.  Plaintiffs complain of a host of unfair and dishonest practices by DZ Atlantic that accompanied the termination of employees found ineligible for per diem compensation.  However, because the court has found that no contract exists between DZ Atlantic and Plaintiffs modifying the at-will nature of the employment relationship, and no attendant breach when DZ Atlantic terminated Plaintiffs' employment, Plaintiffs' claim for breach of contract accompanied by a fraudulent act must also fail.[22]  Accordingly, DZ Atlantic is entitled to summary judgment in their favor on this cause of action.

**Negligence/Gross Negligence**

DZ Atlantic seeks summary judgment on Plaintiffs' claims for negligence and/or gross negligence on the basis that South Carolina common law does not recognize this cause of action in the at-will employment context.  However, the familiar elements of negligence apply in the employment context.  To recover on a negligence cause of action in an employment circumstance, the plaintiff must show that 1) the employer owed a duty to do or not do any of the things alleged; 2) the employer breached this duty; 3) plaintiff was injured; and 4) the employer's breach proximately caused plaintiff's injuries.  *See Gause v. Doe*, 317 S.C. 39, 42, 451 S.E.2d 408, 409 (Ct. App. 1994) (citing *S. C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.,* 289 S.C. 373, 346 S.E.2d 324 (1986)).  "Gross negligence is the intentional, conscious

_____

[22] Because Plaintiffs cannot establish the first element of the claim, the court declines to address the contested issue of whether or not Plaintiffs have demonstrated any fraudulent acts by DZ Atlantic.

failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Rice v. Sch. Dist. of Fairfield*, 317 S.C. 87, 93, 452 S.E.2d 352, 355 (Ct. App. 1994). "For negligent conduct to become actionable, it must violate some specific legal duty owed to the plaintiff." *Id.* The negligence claim must fail if any of the elements of the claim is missing. *Gause,* 317 S.C. at 42, 451 S.E.2d at 409.

The court interprets Plaintiffs' negligence and gross negligence claims as falling into one of two categories: 1) that DZ Atlantic was reckless in the way it terminated its employees; and 2) that DZ Atlantic hired incompetent supervisors, who misrepresented the per diem program to employees, and incompetent investigators, who failed to conduct a proper investigation into allegations that Plaintiffs were misrepresenting their residence information in order to receive per diem payments.

For the reckless termination claim, Plaintiffs sort themselves into 6 categories: 1) those whose termination was based on allegedly flawed residence information obtained from an online service used by DZ Atlantic in its initial investigation; 2) those terminated without having the opportunity to submit additional information to investigators; 3) those who claimed eligibility for per diem compensation based on verbal or written representations allegedly made by DZ Atlantic personnel; 4) those whose resignations or layoffs occurred due to the fact that the specific assignment had ended and were later mischaracterized as wrongful termination; 5) those terminated despite inconclusive evidence of their per diem eligibility; and 6) those terminated for not participating in the investigation and subsequently having their termination classified as falsification of documents.

Plaintiffs allege that DZ Atlantic had a duty to treat Plaintiffs "in accordance with its published documents." Presumably, "published documents" refers to the Employee Handbook,

employment application, and Certificate of Per Diem Eligibility.[23]  DZ Atlantic denies that it owed any duty to its at-will employees.  DZ Atlantic supports its position by citing *Gause v. Doe*, 317 S.C. 39, 451 S.E.2d 408 (Ct. App. 1994), a case in which the plaintiff, a police officer, alleged negligence against his employer for terminating him following a citizen's allegation that the officer sexually assaulted her.  The South Carolina Court of Appeals affirmed the trial court's dismissal of the negligence claim, stating that as an at-will employee, Gause could not establish that his employer owed him any duty.  *Id.* at 409, 451 S.E.2d at 42.[24]  Further, "no South Carolina case law supports the Defendants' assertion that an employer owes an employee a duty of good faith and loyalty." *First Nat. Bank v. First Nat. Bank of the S.*, CA 6:07-2182-HMH, 2007 WL 3232116 (D.S.C. Oct. 31, 2007); *see also Hawkes v. Univ. Physicians, Inc.*, 6 F. Supp. 2d 445, 449 (D. Md. 1998), *aff'd,* 145 F.3d 1324 (4th Cir. 1998) (quoting *Kahalas v. Claims Admin. Corp.,* 1995 WL 795666, 69 Fair Empl. Prac. Cas. (BNA) 816 (D. Md. Mar. 16, 1995) ("To impose a duty on employers to exercise reasonable care . . . would eviscerate the employment-at-will presumption.").

---

[23] To the extent Plaintiffs are suggesting that the Employee Handbook or other employment documents mandated DZ Atlantic follow a particular policy or procedure, which creates a duty owed by DZ Atlantic to its employees, the duty would sound in contract law rather than negligence.  *See Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 54-55, 463 S.E.2d 85, 88 (1995) ("A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty arising independently of any contract duties between the parties, however, may support a tort action.").

[24] Plaintiffs argue erroneously that the holding in *Gause* was merely that State entities have immunity from negligence claims under the South Carolina Tort Claims Act (the "Tort Claims Act").  The court held that the Tort Claims Act barred the police officer's slander claim, but the court's determination as to Gause's negligence claim was made independently of the Tort Claims Act.  317 S.C. at 409, 451 S.E.2d at 42.

As a part of their gross negligence claims, Plaintiffs also allege that DZ Atlantic recklessly mischaracterized Plaintiffs' terminations when it listed the reason for the terminations as falsification of documents.[25]  DZ Atlantic submits that it is required to disclose the fact of an unfavorable termination with the power station's license holder pursuant to Nuclear Regulatory Commission regulations.  *See* NEI 03-01 Rev. 3 § 6.1(c) (requiring that the organization controlling access to the facility be notified about any unfavorable termination of an individual who was granted unescorted access.)  The South Carolina Court of Appeals specifically addressed gross negligence in an at-will employee termination situation in *Rice v. School District of Fairfield*, 317 S.C. 87, 452 S.E.2d 352 (Ct. App. 1994).  In *Rice*, a plaintiff who worked in a food service position as part of a work experience program for welfare recipients sued the school district when it fired her after rumors emerged that she had AIDS. Though employed by the Department of Social Services ("DSS"), Rice sued the school district for gross negligence alleging humiliation, embarrassment, lost wages, injury to reputation and the loss of training opportunities.  *Id.*  The court found that the District was contractually obligated to notify DSS of the situation with Rice such that "no reasonable juror could conclude that the District's communications with DSS were inappropriate or that they rose to the level of gross negligence." *Id.* at 94, 452 S.E.2d at 356.  Moreover, the court found that Rice was an at-will employee at the school and that the District owed her no duty to investigate rumors before reporting to DSS.  *Id.* at 94 n.6, 452 S.E.2d at 356 n.6.  The instant case is similar in that DZ Atlantic had an obligation to report its unfavorable terminations to Duke.  DZ Atlantic conducted its investigations and concluded that Plaintiffs had inaccurately reported, misrepresented or falsified the information provided in their Certificates of Per Diem Eligibility.  However, DZ Atlantic owed no duty to

---

[25] *See supra*, note 2 (discussing Plaintiffs' previously dismissed defamation claim against DZ Atlantic).

their employees to conduct a more thorough investigation because their employees were at-will, and were owed no duty whatsoever regarding their terminations.  *See Bookman v. Shakespeare Co.*, 314 S.C. 146, 149, 442 S.E.2d 183, 184 (Ct. App. 1994) (affirming summary judgment of a lower court decision denying Plaintiff's claim that her employer failed to adequately investigate her sexual harassment claims, even though careful investigation was promised in the sexual harassment policy, on the grounds that the employee was at-will and could be terminated for any reason except in retaliation for making her claim.)

Because DZ Atlantic owed no duty to conduct adequate investigations as to its employees due to the at-will nature of the employment relationship, Plaintiffs cannot prevail on their termination claims.  DZ Atlantic owed its employees no duty to conduct a proper investigation, such that it is immaterial whether the investigation was based on inaccurate data, whether Plaintiffs were given an opportunity to clear up any misunderstandings about their residences or their per diem eligibility, or whether Plaintiffs were fired based on ineligibility or failure to participate in the investigation.  *See Gause*, 317 S.C. at 42, 451 S.E.2d at 409 (stating that at-will employees can "be terminated at any time, for any reason, or for no reason at all, irrespective of any inadequate investigations, false assumptions, or failures to reevaluate on the part of the employer").  For these reasons, Plaintiffs' negligence claims must fail.

**Negligent and/or Intentional Misrepresentation**

DZ Atlantic seeks summary judgment on Plaintiffs' negligent and/or intentional misrepresentation claims for failure to establish issues of material fact on the required elements of their claim.  To prevail on a claim for negligent misrepresentation, a plaintiff must prove that

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff

23

justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.[26]

*Hand v. SunTrust Bank, Inc.*, 6:11-CV-00501-JMC, 2012 WL 3834859 (D.S.C. Sept. 4, 2012) (quoting *Redwend Ltd. P'ship v. Edwards,* 354 S.C. 459, 473, 581 S.E.2d 496, 504 (Ct. App. 2003)).

To demonstrate intentional misrepresentation, a plaintiff must show the following elements:

(1) a representation; (2) falsity; (3) its materiality; (4) knowledge of the falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance upon the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*Redwend Ltd. P'ship v. Edwards*, 354 S.C. 459, 473, 581 S.E.2d 496, 503-04 (Ct. App. 2003). To withstand a motion for summary judgment, a plaintiff must provide clear and convincing evidence in support of a claim alleging fraudulent conduct.   *DeGirolamo v. Sanus Corp. Health Sys.*, 935 F.2d 1286, 1991 WL 103383, at *4 (4th Cir. June 17, 1991) (unpublished table decision) (citing *Anderson*, 477 U.S. at 254-55). Clear and convincing "has been defined as 'evidence  . . . of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established,' . . . and, as well, as evidence that proves the facts at issue to be 'highly probable.'" *Jimenez v.*

---

[26] Throughout their pleadings, both parties have combined the negligent misrepresentation and intentional misrepresentation claims into one discussion.  In their Response to DZ Atlantic's Motion for Summary Judgment, Plaintiffs note that the "key difference between fraud and negligent misrepresentation is that fraud requires the conveyance of a known falsity, while negligent misrepresentation is predicated upon transmission of a negligently made false statement." [Dkt. No. 267 at 33] (citing *Gruber v. Santee Frozen Foods, Inc.,* 309 S.C. 13, 20, 419, S.E.2d 795, 799 (Ct. App. 1992)).  Similarly, DZ Atlantic argues that these causes of action share common elements that are in dispute in this case: whether DZ Atlantic made a false misrepresentation as to what was required for per diem eligibility; whether Plaintiffs relied on those representations when applying for and receiving per diem payments; and whether Plaintiffs were reasonable or justified in relying on the alleged representations.

*DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001).  "Consequently, where the . . .'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."  *Anderson*, 477 U.S. at 244.

Plaintiffs argue that statements by DZ Atlantic supervisors falsely represented the terms of per diem eligibility.  Specifically, Plaintiffs argue 1) that DZ Atlantic negligently, recklessly or knowingly made a false representation in its Certificate of Per Diem Eligibility which did not originally list termination as a possible outcome of being found ineligible for per diem payments; 2) that DZ Atlantic changed the terms and requirements for per diem eligibility by requiring additional documentation; and 3) that DZ Atlantic supervisors made false statements about the terms of per diem eligibility on which Plaintiffs relied.  Plaintiffs further argue that DZ Atlantic benefited from the misrepresentations concerning per diem eligibility because the per diem compensation attracted and retained skilled workers.  Plaintiffs also argue that they suffered a pecuniary loss when they were terminated for falsifying documents, which was the proximate cause of Plaintiffs' loss of their unescorted access authorization necessary for future employment in the nuclear industry. [27]

---

[27] DZ Atlantic contends that Plaintiffs' claims emerge from events surrounding their termination of employment and that all of Plaintiff's remaining claims are wrongful termination claims characterized under various tort and equitable claims.  DZ Atlantic cites this court's opinion in *Hand v. SunTrust Bank, Inc*., 6:11-CV-00501-JMC, 2012 WL 3834859 (D.S.C. Sept. 4, 2012) in which the court found an employee who brought a negligent misrepresentation claim against her employer could not proceed on a claim for negligent misrepresentation because the claim was in the nature of a wrongful termination action and "would nullify South Carolina's employment at-will doctrine."  The court in *Hand* declined to address whether the tort of negligent misrepresentation could ever be properly stated in an employment context under South Carolina law.  However, the court recognizes that Plaintiffs in this case seek more than redress for wrongful termination; they also assert claims related to DZ Atlantic's alleged negligent

Plaintiffs' argument that DZ Atlantic's failure to list termination on the Certificate as a possible outcome of being found ineligible for per diem compensation amounts to a misrepresentation lacks merit. Because an at-will employee may be fired at any time, DZ Atlantic had no duty to inform Plaintiffs that the illicit receipt of per diem payments could be grounds for termination. *See Lampman v. DeWolff Boberg & Assocs., Inc.*, 319 F. App'x. 293 (4th Cir. 2009) (finding no negligent misrepresentation by omission where employer failed to inform an at-will employee that he was a candidate for termination) (citing *Ladvest Assocs. v. Owens*, 276 S.C. 22, 274 S.E.2d 433, 434 (1981)).

Plaintiffs' argument that DZ Atlantic misrepresented the requirements for per diem eligibility because its investigators asked employees suspected of wrongfully receiving per diem compensation to provide additional evidence supporting their claimed residence also lacks merit. Indeed, the Certificate originally required only two out of a list of four possible forms of documentation proving permanent residence, and therefore per diem eligibility.[28] However, the fact that DZ Atlantic only required two forms of proof for initial certification does not demonstrate that it *changed* the fundamental per diem eligibility requirements or, more importantly, that its original requirements amounted to false representations about what was

investigation into employees' eligibility for per diem which ostensibly led to the revocation of Plaintiffs' unescorted access authorization to nuclear facilities, thus impacting their ability to apply their trade in the lucrative nuclear power industry. To the extent that Plaintiffs attempt to prove their misrepresentation claims as to these additional issues, these claims also fail because the misrepresentation for which Plaintiffs seek redress involves DZ Atlantic's disclosure of Plaintiffs' unfavorable terminations to Duke. Such a claim does not concern DZ Atlantic's alleged negligent misrepresentation to Plaintiffs but rather DZ Atlantic's representations to a third party about Plaintiffs. Such a claim does not arise under the tort of negligent misrepresentation.

[28] A later iteration of the form expanded the list to six forms of possible documentation and the most recent version required as many forms of proof as possible, and made proof of mortgage or rental payments mandatory.

required to prove per diem eligibility. Per diem eligibility always required that the employee demonstrate the "maintenance of a permanent residence 50 miles or more away from [the work] site and maintaining a separate residence while employed." Certificates of Per Diem Eligibility [Dkt. No. 272-1, at 85-91]. Further, per diem eligibility also required Plaintiffs to certify by signature that the information provided about their residence was true and accurate.[29] When DZ Atlantic requested additional proof of residence during its investigation, it did not alter the fundamental requirement that employees maintain a permanent residence fifty (50) miles or more from the work site.

Moreover, Plaintiffs were well aware that DZ Atlantic could conduct investigations of its employees at any time. The Employee Handbook is clear that "[t]he employee AGREES . . . to allow such investigations necessary to verify CHARACTER AND BACKGROUND." [Dkt. No. 228-3, at 40] (emphasis in original). Further, the language in the Certificate also suggests that additional investigations could occur in the future: "If I am *found* INELIGIBLE for per diem, I will reimburse to DZ Atlantic any money that has been wrongfully paid for per diem." Certificates of Per Diem Eligibility [Dkt. No. 272-1, at 85-91] (emphasis added). In addition, Plaintiffs signed consent forms allowing DZ Atlantic to conduct background investigations, which put them on notice of DZ Atlantic's ongoing efforts to ensure that it was providing trustworthy employees to Duke in accordance with federal law and the NEI guidelines. Thus, DZ Atlantic was clearly within its right, indeed acting according to established protocol, in conducting inquiries into Plaintiffs it believed were acting in a manner inconsistent with their per diem eligibility certifications. For these reasons, the court finds that DZ Atlantic's request for

---

[29] Plaintiffs suggest that their supervisors, by signing their Certificates, certified that Plaintiffs were eligible for per diem. However, supervisors were merely required to sign the Certificate to "attest to having viewed the appropriate original documentation" submitted by the employee. Certificates of Per Diem Eligibility. [Dkt. No. 272-1, at 85-91].

additional proof of residence during the investigations of employees does not render false the requirements listed in the Certificate of Per Diem Eligibility.

Plaintiffs also claim that DZ Atlantic supervisors made statements that amounted to negligently, recklessly or intentionally-made false representations regarding the actual requirements for per diem eligibility.[30]  These Plaintiffs further argue that they were justified in relying on these statements and that they did so to their detriment.  Plaintiffs argue that DZ Atlantic supervisors, particularly Donnie Curl, routinely encouraged Plaintiffs to apply for per diem eligibility.  Specifically, Plaintiffs testified that Curl said the following:[31]

- "Its [per diem] there, you need to get it."  Barry Evett Deposition, Ex. 126 at 63: 25-64: 1-23 [Dkt. No. 274-2 at 73].

- "You need to get on the train like everybody else."  William Anthony Deposition, Ex. 3 at 143: 18-25 [Dkt. No. 272 at 219].

- "If you ain't getting per diem, change your address." Roger Byers Deposition, Ex. 111 at 36-38  [Dkt. No. 274-1 at 16-18].

In addition to these exhortations, Plaintiffs claim that Donnie Curl and other supervisors told employees that the purpose of the per diem program was to supplement an employee's pay in light of the fact that DZ Atlantic did not give bonuses, pay overtime, provide benefits, or offer vacation days.  Thus, Plaintiffs contend that DZ Atlantic characterized the per diem program as a recruiting tool meant to attain and attract employees.  Many Plaintiffs claim to have had this

---

[30] Plaintiff Iseli made allegations in her complaint regarding statements by DZ Atlantic supervisors about per diems, but she did not testify to these statements in her deposition.

[31] Plaintiffs also point to statements made by supervisors Dennis Dale, Dean Jacobs, and Kim Ingle, but the majority of Plaintiffs accuse Curl of making misrepresentations.

understanding of DZ Atlantic's per diem policy, either as a result of direct statements from supervisors or indirect statements that were ultimately attributed to DZ supervisors.[32]

These Plaintiffs assert that Curl's encouragement, combined with his explanations that per diem compensation was merely supplemental income, led them to rely on Curl's explanation of what was necessary for per diem eligibility.  Many Plaintiffs testified that Curl told them they were eligible for per diem if they provided two documents of proof showing an address fifty (50) miles from that Plaintiff's particular work site.  Those who pressed Curl for specific assurances as to whether their plan to list a certain address was legitimate under the program were typically met with what some describe as Curl's famous phrase – "I'm not the per diem police."  *See e.g.* Abel Trevino Deposition, Ex. 101 at 92:1-93:1 [Dkt. No.274, at 174-75].[33]   Several Plaintiffs attest that Curl told them that it did not matter where they lived, so long as the address they listed as their permanent address was more than fifty (50) miles from the site and that they could support the address with required documentation. Other Plaintiffs testified that Curl insinuated that it did not matter where they actually lived.  For example, Curl allegedly told Plaintiff Prince, "Well Gary Dean, get me an address that's fifty (50) miles away from the plant and I'll give you per diem.  I don't care where you lay your head at, so long as you give me an address that's fifty (50) miles away, two proofs of address."

---

[32] DZ Atlantic had an official policy on per diem eligibility that explained the purpose of per diem eligibility was to duplicate living expenses and that the program was in accordance with IRS Regulations.  *See* Per Diem Policy for All DZ Atlantic Employees, Ex. 6 [Dkt. No. 272 at 236]. Ross McConnell, Dennis Dale, and Donnie Curl testified that the Per Diem Policy was not provided to Plaintiffs.

[33] Plaintiff Trevino asked Curl about the requirements for per diem eligibility, to which Curl replied that he would need to show two proofs of residence beyond the fifty-mile radius of Trevino's work site.  Trevino then told Curl that he had "property available" to him in Texas and asked if that "would be okay."  Curl allegedly responded, "I'm not the per diem police."

Ultimately, seventeen (17) of the forty-nine (49) Plaintiffs in this action admitted that they never lived at the address they listed on their Certificate of Per Diem Eligibility forms. Plaintiffs now assert that their DZ Atlantic supervisors negligently or intentionally misrepresented the requirements for per diem eligibility. These Plaintiffs argue that the Certificate, and specifically the phrase "permanent residence" as it appears on the Certificate, is ambiguous such that statements by DZ Atlantic supervisors amounted to false representations concerning what was actually required of employees for per diem eligibility.

The court is not persuaded that the Certificate is ambiguous, or specifically, that the term "permanent residence" is laden with ambiguity as Plaintiffs suggest: the term has a plain and ordinary meaning. "Permanent" is defined as "continuing or enduring (as in the same state, status, place) without fundamental or marked change . . . fixed or intended to be fixed; lasting, stable." Webster's Third New International Dictionary 1683 (2002). "Residence" is defined as "the act or fact of abiding or dwelling in a place for some time . . . a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." Webster's Third New International Dictionary 1931 (2002). The coupling of the two words suggests an abode or dwelling where one continues to live and where one intends to return. This construction is consistent with the legal definition operative in South Carolina construing the phrase "permanent residence" to have the same meaning as domicile. *See Nagy v. Nagy-Horvath*, 273 S.C. 583, 586, 257 S.E.2d 757, 759 (1979) ("the word 'reside' or 'residence' as used in statutes pertaining to the venue of an action for divorce is synonymous with 'domicile' and denotes the place of one's fixed abode, not for a temporary purpose alone, but with the intention of making such place a permanent home"); *see also Quattlebaum v. Bowen*, 3:85-2962-3, 1986 WL 122177 (D.S.C. Aug. 7, 1986) ("Domicile

has been defined as the permanent residence of a person. It is the place to which a person intends to return even though he may actually reside elsewhere.").

A person's permanent residence may indeed involve a close examination of the surrounding facts and circumstances. The circumstances related to DZ Atlantic's non-local employees are perhaps different than workers in other industries as many non-local DZ Atlantic employees who claim a permanent residence beyond the fifty-mile radius from the work site also work 12 hours-a-day, 6 days a week for weeks or months at a time.  For these non-local employees then, it is entirely reasonable that they might not be able to travel to their permanent residence until a particular job ends or until that particular work crew has an extended hiatus.

However, some Plaintiffs assert such a strained interpretation of permanent residence that reliance on their proposed definition, even if supported by alleged statements by DZ Atlantic supervisors, would be unreasonable.  Specifically, these Plaintiffs suggest that DZ Atlantic supervisors made representations that "permanent residence" *actually meant* the address listed on their driver's license and voter registration card since that is all that was required as proof of residence on the Certificate of Per Diem Eligibility.  This construction conflates *proof* of permanent residence with the *fact* of permanent residence. In deposition testimony, these Plaintiffs continually asserted that the address listed on their driver's license was their permanent address even after admitting that they spent little to no time at the address listed on those documents.  Such a construction places form over substance in the most absurd way.  Even still, a driver's license is an official document, which DZ Atlantic could have reasonably assumed would have shown the address of the holder's actual permanent residence.  Such is the same for the holder's voter registration card.  Thus, even if Plaintiffs can show that DZ Atlantic supervisors made representations that an employee's permanent address was little more than

31

what was listed on the employee's driver's license, no reasonable person could claim justifiable reliance on that construction of the term, especially given the Certificate's explicit requirement that per diem eligible employees had to *maintain* a permanent residence, not just provide proof of one. Further, statements by DZ Atlantic supervisors which encouraged Plaintiffs to apply for per diem, or merely let them know that per diem was available to them are casual statements for which there can be no liability under fraud and misrepresentation claims. *See West v. Gladney*, 341 S.C. 127, 134, 533 S.E.2d 334, 337 (Ct. App. 2000).

Perhaps most importantly, Plaintiffs were required to sign the Certificate of Per Diem Eligibility, certifying that the information provided in the document was accurate and truthful. As a result, the court finds Plaintiffs' reliance on the notion that permanent address means whatever DZ supervisors represented it to mean is unreasonable. South Carolina law is clear that "[o]ne cannot complain of fraud in the misrepresentation of the contents of written instruments signed by him when the truth could have been ascertained by reading the instrument, since one entering into the written contract should read it and avail himself of every opportunity to understand its content and meaning." *Hooters of America, Inc. v. Phillips*, 39 F. Supp. 2d 582, 607 (D.S.C. 1998); *see also Doub v. Weathersby-Breeland Ins. Agency*, 268 S.C. 319, 326, 233 S.E.2d 111, 114 (1977). This court's recent ruling in *Hand* followed this logic; there, the court held that a plaintiff who had access to the company's policy could not argue reasonable reliance on inaccurate statements from her supervisors. *Hand,* 2012 WL 3834859, at *4.

Here, the court finds that Plaintiffs could have easily determined what was required by the Certificate of Per Diem Eligibility, such that reliance on statements in contravention of the Certificate would have been unreasonable. Given this holding Plaintiffs cannot claim reliance on these statements, promises or inducements, which contradict what the Certificate plainly

32

requires.  Plaintiffs knew or should have known that supervisors do not have the authority "to contradict any policy set forth in the handbook." Employee Handbook, [Dkt. No. 228-3, at 47]. Given the handbook's explicit prohibition on falsifying applications, Plaintiffs cannot now claim reasonable reliance on the statements of their supervisors which may have led them to list as their permanent addresses places where they had minimal or no connection.  In addition, DZ Atlantic presents persuasive case law from outside of this district for the otherwise axiomatic proposition that supervisors cannot authorize misconduct by its employers and employees cannot escape the consequences of relying on such authorizations.[34]  Finally, it is important also to note that most Plaintiffs have testified that no one at DZ told them to lie on their per diem forms or to violate company policy.  Those that claim that Donnie Curl told them to lie admit to having never even lived at the addresses listed on their Certificate.

For all of these reasons, even if the statements by DZ Atlantic supervisors can be characterized as false because they omitted crucial pieces of information, Plaintiffs cannot legitimately claim to have relied on these statements alone, since the Certificate that each employee signed explicitly included all of the necessary requirements.  This court has determined that those requirements are plain on their face, and not subject to multiple meanings that would be material to their definition.  To the extent that Plaintiffs found any statement by a

---

[34] *Kazensky v. City of Merced*, 76 Cal. Rptr. 2d 356,373 (Cal. Ct. App. 1998) ("A supervisor could not authorize the theft of city time any more than he or she could authorize the theft of city equipment or tools"); *Gilmore v. Indus. Claim Appeals Off.*, 187 P.3d 1129,1133 (Colo. Ct. App. 2008) (employee fired for smoking marijuana on the job could not challenge his discharge on the grounds that his supervisor gave him the drugs when the express language of the employer's policy prohibited the use of drugs.); *Temple Univ. v. Unemployment Compo Bd. of Review*, 772 A.2d 416,419 (Pa. 2001) (holding "that claimant's belief that his supervisor had the authority to authorize payment for hours not worked did not establish good cause for his misconduct in applying for and accepting payment for hours not worked, so as to render him eligible for unemployment compensation benefits").

supervisor to be at odds with that employee's understanding of the permanent residence requirement, the employee knew or should have known that the supervisor did not have authority to alter or amend company policy or company documents. When Plaintiffs signed the Certificate of Per Diem Eligibility, which likely occurred after any supervisor made any statements regarding per diem eligibility, they certified to DZ Atlantic the truth of the information provided in the Certificate. At that point, the signer adopted the statements contained within the Certificate, took absolute responsibility for those statements and surrendered his right to claim reliance on any alleged misrepresentations by DZ Atlantic supervisors.

Three Plaintiffs, Clary, Fagg, and Moore, complain that the Certificate of Per Diem Eligibility is also vague regarding the distance a person must live from the site in order to receive per diem payments, such that statements by DZ Atlantic supervisors about per diem eligibility amounted to misrepresentations.[35]  Specifically, the Certificate states that "eligibility for per diem is contingent upon maintenance of a permanent residence 50 miles or more away from site and maintaining a separate residence while employed." [Dkt. No. 272-1, at 85-91]. Plaintiffs Clary, Fagg, and Moore all testified that the route they drove to work was longer than fifty (50) miles, even if the distance calculated by DZ Atlantic between destinations was less than fifty (50) miles. Plaintiffs nevertheless assumed they qualified for per diem payments. The record indicates that DZ Atlantic supervisors did not provide employees with DZ Atlantic's Per Diem Policy, which provided that was measured by "the shortest or the quickest route" as determined by "a valid mileage program such as MapQuest." Per Diem Policy [Dkt. No. 272 at 236].

---

[35] In their Response to DZ Atlantic's summary judgment motion, Plaintiffs suggest that this misunderstanding about the fifty-mile requirement was the primary reason why Plaintiffs were investigated concerning their per diem eligibility. However, DZ Atlantic claims other alleged inaccuracies or inconsistencies led to the investigation.

However, even assuming these three Plaintiffs were terminated based on inconsistencies between themileage calculation methods by them and DZ Atlantic, they still only  fundamentally challenge DZ Atlantic's investigation and have not identified any actionable false representation. As this court has previously noted, deficiencies in DZ Atlantic's investigation do not provide Plaintiffs the relief they seek through the claims they have asserted due to the at-will nature of their employment.

Finally, eighteen (18) Plaintiffs[36] testified that, sometime in the spring or early summer of 2009, DZ Atlantic supervisors encouraged these Plaintiffs to classify themselves as local employees if they wanted to be considered for Duke's core team of employees who maintained more consistent and continuous work schedules. Plaintiffs present different understandings of what the DZ Atlantic supervisors related to them, some of which invoke the negligent or intentional misrepresentation claims.  Some indicated that they understood that they would be considered for the core team if they became local.  *See e.g.,* Roy Jewel Deposition, Ex. 132 at 46:6-21 [Dkt. No. 274-2, at 175].  However, others claim that they understood their supervisors to mean that if they decided to give up their per diem payments and declare themselves local, they would be able to keep or retain their job.  *See e.g.,* Dewy Roberts Deposition, Ex. 38 at 121:12-122:20 [Dkt. No. 272-3, at 122-123].  Still others assert that site supervisor Dennis Dale suggested that DZ Atlantic was aware that some people were receiving per diem payments illegitimately and that nothing would happen to those employees that gave up their per diem eligibility.  *See* Mark David Shepherd Deposition, Ex. 19 at 155:17-158:3 [Dkt. No. 272-1, at 165-66].

---

[36] These Plaintiffs include Braswell, Chappell, Dickert, G. Evatt,, R. Evatt, R. Jewell, Kelly, McQueen, Pace, Drost, Stewart, and Shepherd from the *Anthony* Litigation, and Adams, Mayfield, C. Roberts, D. Roberts, Robinson and Ford from the *Adams* litigation.

To the extent that Plaintiffs contend that these representations amounted to an assurance that they would not be terminated, the court finds this argument unavailing.  Under South Carolina law, a promise of continued employment is illusory where the nature of the relationship is at-will and the employer retains the right to terminate the employment relationship.  *See Poole v. Incentives Unlimited, Inc.*, 338 S.C. 271, 275, 525 S.E.2d 898, 900 (Ct. App. 1991); *see also White v. Roche Biomedical Laboratories, Inc.*, 807 F. Supp. 1212, 1219-20 (D.S.C. 1992) *aff'd*, 998 F.2d 1011 (4th Cir. 1993)  ("a promise of employment for an indefinite duration with no restrictions on the employer's right to terminate is illusory since an employer who promises at-will employment has the right to renege on that promise at any time for any reason.").  Furthermore, "reliance on a promise consisting solely of at-will employment is unreasonable as a matter of law since such a promise creates no enforceable rights in favor of the employee other than the right to collect wages accrued for work performed. *White*, 807 F. Supp. at 1219-20 (citing *Colosi v. Electri-Flex Co.,* 965 F.2d 500, 504 (7th Cir. 1992)).

Two Plaintiffs, Shepherd and Adams, allege slightly different statements made by a DZ Atlantic supervisor regarding the local initiative.  Shepherd testified that he was told that if he dropped his per diem eligibility, it would not be held against him.  Adams testified that he was told that if employees dropped their per diem claims and became local employees, "no questions would be asked."  Adams Deposition, Ex. 104, at 132: 1-9; 185:1-10, [Dkt No.  274, at 258; 267].  Though these statements are vague, these Plaintiffs assert that DZ Atlantic  offered amnesty for those employees whose per diem eligibility was questionable.  Because Plaintiffs note that the employee terminations began soon after these statements, Plaintiffs suggest these statements were meant to lure out those employees who were ineligible for per diem compensation.  The court finds that Plaintiffs Adams and Shepherd have not created an issue of

fact as to whether such statements were negligent or intentional misrepresentations since these Plaintiffs through their testimony implicitly acknowledge that they were not eligible for per diem.. Thus, their claims must fail.

**Fraudulent Inducement**

DZ Atlantic argues that it is entitled to summary judgment on Plaintiffs' claim that DZ Atlantic supervisors fraudulently induced some Plaintiffs to apply for per diem compensation with the knowledge that those Plaintiffs were not eligible for such benefits for the purpose of recruiting and retaining good workers. To establish a claim for fraud in the inducement to enter into a contract, a plaintiff must show:

> (1) a representation; (2) its falsity; (3) its materiality; (4) knowledge of the falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance upon the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*Redwend Ltd. P'ship v. Edwards*, 354 S.C. 459, 473, 581 S.E.2d 496, 503-04 (Ct. App. 2003). In addition to these nine elements, a plaintiff must prove "(1) that the alleged fraudfeasor made a false representation relating to a present or preexisting fact; (2) that the alleged fraudfeasor intended to deceive him; and (3) that he had a right to rely on the representation made to him." *Darby v. Waterboggan of Myrtle Beach, Inc.,* 288 S.C. 579, 584, 344 S.E.2d 153, 155 (Ct. App. 1986); *Moseley v. All Things Possible, Inc.,* 388 S.C. 31, 36, 694 S.E.2d 43, 45 (Ct. App. 2010), *reh'g denied* (June 24, 2010), *cert. granted* (Mar. 17, 2011), *aff'd,* 395 S.C. 492, 719 S.E.2d 656 (2011). Furthermore, fraud claims must be supported by clear and convincing evidence. *Moseley*, 338 S.C. at 36, 694 S.E.2d at 44.

As a preliminary matter, DZ Atlantic argues that Plaintiffs have failed to cite to any facts in the record that would support their claims, presenting only statements in support of the attorney's argument. DZ Atlantic argues that courts do not ordinarily "consider statements of

fact presented only in an attorney's argument in determining whether a genuine issue of material fact exists sufficient to preclude summary judgment." *West,* 341 S.C. at 135, 533 S.E.2d at 337 (Ct. App. 2000). Further, DZ Atlantic argues that even if a court considers the claims, it should only do so with regard to those Plaintiffs who relied on statements by Donnie Curl, as the few facts that Plaintiffs' present are all based on alleged conduct and statements by Curl. DZ Atlantic suggests that Plaintiffs have waived this argument as to those Plaintiffs not collected in Plaintiffs' group labeled, "Plaintiffs Who Relied on their Supervisors."

First, the court agrees with DZ Atlantic that Plaintiffs' arguments as to its fraudulent inducement claims are "sparse." However, the court also notes that the elements of fraudulent inducement and the evidence that would support this claim are nearly identical to what would be required under Plaintiffs' negligent and intentional misrepresentation claims. These claims are supported by citations to evidence in the record. The court understands the primary thrust of Plaintiffs' argument for fraud in the inducement to be that DZ Atlantic supervisors used the per diem program to attract and retain good workers for employment with the company.

Second, it is inappropriate to limit Plaintiffs' claims to one particular group, Plaintiffs' group four, when Plaintiffs' grouping represented an attempt to clarify issues and when Plaintiffs made clear that some Plaintiffs share issues with other Plaintiffs. *See* Plaintiffs' Response to Defendant's Motion for Summary Judgment at 34, n. 28 [Dkt. No. 267]. With regard to Donnie Curl's statements, many Plaintiffs claim that he made representations to them. For these reasons, the court will address Plaintiffs' fraudulent inducement claim.

As noted above, Plaintiffs' action for fraudulent inducement shares common elements with Plaintiffs' claim for intentional misrepresentation. Accordingly, DZ Atlantic reasserts its argument that, because the Certificate explicitly required the worker to maintain a permanent

residence fifty (50) miles or more from the work site as well as maintain a temporary residence while on assignment, Plaintiffs cannot now claim fraudulent conduct by DZ Atlantic. *See Doub*, 268 S.C. at 326, 233 S.E.2d at 114 (1977) (stating that a plaintiff "cannot complain of fraud in the misrepresentation of the contents of a written instrument in his possession when the truth could have been ascertained by his reading the instrument."). As previously discussed, Plaintiffs cannot demonstrate that it was reasonable for them to rely on the statements of DZ Atlantic supervisors when those statements contradicted the requirements listed in the Certificate of Per Diem Eligibility and the policies in the Employee Handbook. Therefore, the court reiterates its finding that Plaintiffs have not established reasonable reliance, which is an element of both misrepresentation and fraudulent inducement.

Further, the court finds that Plaintiffs have not presented sufficient evidence of a clear and convincing nature that DZ Atlantic intended not to pay Plaintiffs per diem compensation. Under South Carolina law, promises made about future action cannot support fraudulent misrepresentation unless the alleged fraudfeasor had no intention of "doing what it promised at the time the promises were made." *Tom Hughes Marine, Inc. v. Am. Honda Motor Co., Inc.*, 219 F.3d 321, 325 (4th Cir. 2000). Assuming *arguendo* that Plaintiffs had established the reasonable reliance element, Plaintiffs fail to point to any evidence that DZ Atlantic supervisors intended to deceive them when the supervisors made statements about what was required for per diem eligibility. Even if Plaintiffs were negligent or reckless in explaining per diem eligibility to Plaintiffs, there is no evidence suggesting that they intended Plaintiffs to apply for per diem compensation only to be subsequently rejected for eligibility. To the contrary, DZ Atlantic paid thousands of dollars in per diem payments to employees who claimed eligibility, demonstrating the company clearly intended to perform for those Plaintiffs claiming eligibility. For this reason,

39

the court grants summary judgment on DZ Atlantic's Motion for Summary Judgment on Plaintiffs' claims for fraudulent inducement.

**Promissory Estoppel**

DZ Atlantic seeks summary judgment on Plaintiffs' promissory estoppel claims on the basis that Plaintiffs have identified no unambiguous promises made by DZ Atlantic that would justify Plaintiffs misrepresenting their permanent residence address in order to claim per diem eligibility. To establish a claim for promissory estoppel, a plaintiff must demonstrate that

> 1) a party made a promise unambiguous in its terms; (2) the party to whom the promise is made reasonably relied on the promise; (3) the reliance was expected and foreseeable by the party who made the promise; and (4) the party to whom the promise is made sustained injury in reliance on the promise.

*Stevens & Wilkinson of S. Carolina, Inc. v. City of Columbia*, 396 S.C. 338, 348, 721 S.E.2d 455, 460 (Ct. App. 2011), *reh'g denied* (Jan. 27, 2012) (citing *Woods v. State,* 314 S.C. 501, 505, 431 S.E.2d 260, 263 (Ct. App. 1993)). "The applicability of the doctrine of promissory estoppel depends on whether the refusal to apply it would virtually sanction the perpetration of fraud or would result in other injustice." *Citizens Bank v. Gregory's Warehouse, Inc.,* 297 S.C. 151, 154, 375 S.E.2d 316, 318 (Ct. App. 1988); *Craft v. S. Carolina Comm'n for Blind*, 385 S.C. 560, 565, 685 S.E.2d 625, 627 (Ct. App. 2009). DZ argues that, in this case, applying promissory estoppel would sanction Plaintiffs' illicit receipt of per diem payments.

Plaintiffs' arguments in support of their promissory estoppel claims are similar to those made in their misrepresentation claims. Essentially, Plaintiffs claim DZ Atlantic, through the Certificate of Per Diem Eligibility and through statements by DZ Atlantic supervisors, made unambiguous promises and assurances about the terms of per diem eligibility and the consequences for being found ineligible for per diem payments upon which Plaintiffs relied to their detriment.

First, Plaintiffs argue that DZ Atlantic unambiguously promised that the only penalty for being found ineligible for a per diem compensation was reimbursement, not termination. Plaintiffs argue they relied on this alleged promise contained in the Certificate and that it was reasonable to rely on DZ Atlantic's alleged promise that, if Plaintiffs were found ineligible, they would be required only to repay DZ Atlantic, but would not lose their jobs. As discussed in this order's breach of contract/wrongful termination section above, the Certificate does not so limit DZ Atlantic's ability to terminate employees found to be ineligible for per diem compensation. Even if, as Plaintiffs argue, the Certificate implicitly limited DZ Atlantic's ability to terminate its employees, Plaintiffs could not then argue that the language in the Certificate was unambiguous; the inference of such an argument is that the language is in fact ambiguous and capable of multiple meanings. Further, Plaintiffs cannot point to any oral assurances or promises that they would not be fired for being found ineligible for per diem or that DZ Atlantic would not report the termination to Duke. Because Plaintiffs cannot direct the court to any specific, unambiguous promises that would in any way limit DZ Atlantic's ability and right to terminate its at-will employees, Plaintiffs fail to establish the first element for proving a *prima facie* case of promissory estoppel. Therefore, the court grants DZ Atlantic's summary judgment motion as to Plaintiffs' claims for promissory estoppel in regard to alleged promises not to terminate ineligible employees.

Second, Plaintiffs allege that their supervisors made unambiguous promises and assurances about the terms for per diem eligibility. Specifically, Plaintiffs point to statements by DZ Atlantic supervisors indicating that Plaintiffs would be eligible for per diem if they could submit two proofs of a permanent residence fifty (50) miles or more from the Plaintiff's work site. Plaintiffs who relied on their supervisor's statements regarding per diem eligibility were

later investigated as a result of applying for and receiving per diem payments.  Following their investigation, DZ Atlantic determined that these Plaintiffs were not, in fact, eligible and terminated these employees for falsifying their per diem eligibility forms.  As discussed above, Plaintiffs who relied on statements by DZ Atlantic supervisors as to what was required for per diem eligibility and who also listed addresses to which they only had minimal or no connections cannot now rely on those statements.  To the extent there were statements made by DZ Atlantic's supervisors that obscured what was required to prove a person's "permanent residence," no Plaintiffs could reasonably claim that maintaining a "permanent residence" *means* the address listed on one's license.  Second, DZ Atlantic argues persuasively that any Plaintiff who conflated proof of permanent residence with the fact of permanent residence and provided a false address acted inequitably such that this court should not grant that Plaintiff any equitable relief.  Furthermore, Plaintiffs were required to sign the Certificate of Per Diem Eligibility, and in doing so, each Plaintiff certified the truth and accuracy of the address listed as a permanent residence.

Finally, the group of Plaintiffs discussed above who claim that they were encouraged to modify their per diem eligibility status to be considered local employees in order to keep their jobs reassert their claims in the promissory estoppel context.  This argument is unpersuasive here for the same reason it was unpersuasive in the misrepresentation context: "reliance on a promise consisting solely of at-will employment is unreasonable as a matter of law since such a promise creates no enforceable rights in favor of the employee other than the right to collect wages accrued for work performed." *White*, 807 F. Supp. at 1219-20. As discussed above, Plaintiffs Shepherd and Adams contend that statements made by DZ Atlantic supervisors were not necessarily about keeping their jobs, but suggested more broadly that renouncing per diem eligibility "would not be held against" employees and "no questions would be asked."  Plaintiffs

claim to have changed their addresses in reliance on these statements and were subsequently investigated. However, neither Adams nor Shepherd have asserted a genuine issue of material fact as to whether they reasonably relied on these statements because they essentially admit that they were not eligible for per diem..

**Waiver**

DZ Atlantic claims that it is entitled to summary judgment on all of Plaintiffs' claims because all DZ Atlantic's employees signed an Authorization for Release of Information form, which included the following waiver:

> IN WITNESS WHEREOF, I hereby release Atlantic from any and all liability for damage of whatever kind to me, my family, heirs, associates, representatives, or agents as a result of my being granted or denied a clearance for access to any nuclear power station."

*See e.g.*, Exhibit 16, Bumgarner Exhibits, Authorization for Release of Information form, [Dkt. 255-5 at 24].

In their reply to DZ Atlantic's Motion for Summary Judgment, Plaintiffs point to the following language contained in the same document:

> "I hereby release anyone addressed above [a list which includes past and present employers] who gives information about me in the course of an investigation covered by this authorization, from any and all liability for damages of whatever kind to me, my family, heirs or associates as a result of giving such information; "EXCEPT, I do not release anyone who gives information that is knowingly false, deliberately, intending to harm me or any one of my family, heirs or associates."

*Id.*[37]

DZ Atlantic is correct in its assertion that exculpatory contracts, while having been upheld under the notion that parties are free to contract as they please are still generally

---

[37] Plaintiffs do not challenge DZ Atlantic's formulation of the law regarding exculpatory language in contracts. The court, however, disagrees with DZ Atlantic's interpretation of the impact of the waiver provision in this case.

disfavored and must be strictly construed against the party that relies on the contract.   *See McCune v. Myrtle Beach Indoor Shooting Range, Inc.*, 364 S.C. 242, 249, 612 S.E.2d 462, 465-66 (Ct. App. 2005); *Fisher v. Stevens*, 355 S.C. 290, 295, 584 S.E.2d 149, 152 (Ct. App. 2003).

In order for an exculpatory contract to be upheld, the injury for which a party seeks indemnification must be specific, not general in nature.   *See McCune*, 364 S.C. at 249, 612 S.E.2d at 465-66 (upholding an exculpatory contract where the agreement was voluntarily entered into and which stated with specificity that the plaintiff assumed both known and unknown risks, and the plaintiff released the defendant from liability for its own negligence).   In addition, exculpatory contracts must not contravene public policy.  *See Pride v. S. Bell Tel. & Tel. Co.*, 244 S.C. 615, 619-20, 138 S.E.2d 155, 157 (1964) ("[O]ur decisions recognize the general principle that considerations of public policy prohibit a party from protecting himself by contract against liability for negligence . . . when the parties are not on roughly equal bargaining terms.").

In this case, the injury from which DZ Atlantic seeks indemnity is any injury arising out of loss of access to nuclear facilities.  This is the precise injury Plaintiffs now claim.  Therefore, the court finds that the exculpatory language is specific enough to pass the first prong of this test.

As for public policy, the court finds DZ Atlantic's requirement that Plaintiffs sign the release as a condition of employment created an unequal bargaining situation, such that the waiver could violate public policy.   *See e.g., Waggoner v. Nags Head Water Sports, Inc.*, 141 F.3d 1162 (4th Cir. 1998) ("Only where 'it is necessary for [the plaintiff] to enter into the contract to obtain something of importance to him which for all practical purposes is not obtainable elsewhere' will 'unequal bargaining power' void an exculpatory clause.") (quoting *Hall v. Sinclair Refining Co.,* 89 S.E.2d 396, 398 (N.C. 1955);  *see also Kocinec v. Pub. Storage,*

*Inc.*, 489 F. Supp. 2d 555, 560 (E.D. Va. 2007) (noting that exculpatory provisions in contracts are void when imposed by an employer as a condition of employment).

South Carolina courts have not discussed whether exculpatory contracts agreed to as a requirement of employment are void as against public policy. In support of its argument, DZ Atlantic cites *McCleskey v. Vericon Res., Inc.*, 589 S.E.2d 854, 856 (Ga. Ct. App. 2003), a case in which the Court of Appeals of Georgia found that the plaintiff who signed an employment contract which included exculpatory language releasing his employer from any and all claims stemming from a background check was barred from pursuing a negligence claim against the employer. The *McCleskey* court did not engage in a lengthy analysis of the exculpatory contract, holding only that such contracts are generally accepted in Georgia "absent evidence of gross negligence or willful or wanton misconduct." *Id.* (citing *Hall v. Gardens Svcs.,* 332 S.E.2d 3 (Ga. Ct. App. 1985)) ("Exculpatory clauses in contracts in Georgia are valid and binding and not void as against public policy where the bailor relieves himself from his own negligence, except for that negligence which amounts to willful and wanton misconduct."). Given the lack of a broader public policy analysis in *McCleskey*, this court is more persuaded by the case law noted above from Virginia and North Carolina, finding that, in the public policy analysis, consideration must be given to the bargaining positions of the parties. Consequently, the court finds that the waiver does not bar Plaintiffs from bringing this action.

**DZ Atlantic's Counterclaims[38]**

DZ Atlantic seeks summary judgment on its counterclaims for unjust enrichment, promissory estoppel, and conversion "against all Plaintiffs who have admitted to falsification of Certificates of Per Diem Eligibility."[39] While DZ Atlantic seeks summary judgment on three counterclaims, it seeks only one remedy.[40] DZ Atlantic requests the return of the per diem monies paid to those Plaintiffs whom it contends lied about their permanent residences or otherwise illicitly misrepresented their residence information in order to receive per diem payments to which they were not entitled. To prevail on summary judgment for its counterclaims, DZ Atlantic must demonstrate that there is no genuine issue as to any material fact and that it is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 323.

**A. Unjust Enrichment**

In order to establish unjust enrichment, DZ Atlantic must establish that it 1) conferred a benefit on the plaintiff; 2) that the plaintiff realized that benefit; and 3) that retention of the

---

[38] DZ Atlantic filed counterclaims for unjust enrichment, promissory estoppel, conversion, fraud, intentional misrepresentation, breach of duty of loyalty and civil conspiracy. It moves for summary judgment only on its counterclaims for unjust enrichment, promissory estoppel and conversion, but expressly preserved the other causes of action.

[39] In this group of Plaintiffs, DZ Atlantic includes Anthony, Chappell, Dickert, Ernandez, Ertzberger, G. Evatt, R. Evatt, B. Evett, Iseli, Kelly, B. McGuffin, K. McGuffin, Oliver, Parham, Price, Prince, Rhodes, Smith, Spoone, Suttles, Trevino, and Winchester from the *Anthony* litigation. DZ Atlantic includes Adams, Byers, Clary, Ford, Harris, Lanning, Mayfield, Moore, Reese and Robinson from the *Adams* litigation.

[40] To the extent DZ Atlantic seeks summary judgment on multiple claims, the court finds that DZ Atlantic is entitled to no more than one recovery from a particular Plaintiff. *See Collins Music Co. v. Smith,* 332 S.C. 145, 147, 503 S.E.2d 481, 482 (Ct. App. 1998) ("It is well settled in this state that there can be no double recovery for a single wrong and a plaintiff may recover his actual damages only once.") (internal quotation marks omitted).

benefit by the plaintiff under the particular circumstances of the case would "make it inequitable for the [plaintiff] to retain it without paying its value." *QHG of Lake City, Inc. v. McCutcheon*, 360 S.C. 196, 202-03, 600 S.E.2d 105, 108 (Ct. App. 2004). In this case, the first two elements are undisputed: DZ Atlantic paid per diem compensation to Plaintiffs and Plaintiffs realized the benefit of additional pay. However, DZ Atlantic argues that it meets the third prong of the test because it would be unjust for those Plaintiffs who admittedly falsified or otherwise misrepresented their residence information on their Certificate of Per Diem Eligibility to retain their per diem payments. Plaintiffs contend that it would be inequitable for DZ Atlantic to collect per diem repayments from them because Plaintiffs testified in their depositions that DZ Atlantic supervisors misrepresented the requirements for per diem eligibility, misrepresented the purpose of the per diem program and enticed Plaintiffs to participate in the per diem program, either with knowledge that some Plaintiffs did not meet the program's specific requirements or without regard for whether Plaintiffs were actually eligible for the per diem program. Upon review of the record, the court notes that, although the express language of the Certificate and Employee Handbook rendered Plaintiffs' reliance arguments unreasonable as related to the alleged conduct and statements of DZ Atlantic personnel, Plaintiffs have provided sufficient evidence of conduct and statements by DZ Atlantic personnel to create a genuine issue of material fact as to whether it is inequitable for Plaintiffs to retain the benefits under the circumstances of this case. For this reason, the court denies DZ Atlantic's Motion for Summary Judgment on its unjust enrichment counterclaim.

### B. Promissory Estoppel

To prevail on its claim for promissory estoppel, DZ Atlantic must prove

1) a party made a promise unambiguous in its terms; (2) the party to whom the promise is made reasonably relied on the promise; (3) the reliance was expected

47

and foreseeable by the party who made the promise; and (4) the party to whom the promise is made sustained injury in reliance on the promise.

*Stevens & Wilkinson of S.C., Inc.,* 396 S.C. at 348, 721 S.E.2d at 460. "The applicability of the doctrine of promissory estoppel depends on whether the refusal to apply it would virtually sanction the perpetration of fraud or would result in other injustice." *Citizens Bank,* 297 S.C. at 154, 375 S.E.2d at 318; *Craft*, 385 S.C. at 565, 685 S.E.2d at 627.

DZ Atlantic contends that Plaintiffs made an unambiguous promise that they met the per diem eligibility requirements when they signed a Certificate of Per Diem Eligibility claiming a permanent residence fifty (50) miles or more from their work site. DZ Atlantic claims it was entitled to rely on the truth of these promises and that their reliance on these promises was foreseeable by Plaintiffs. Finally, DZ Atlantic claims that by paying per diem compensation in reliance on Plaintiffs' promise it suffered a monetary injury.

Plaintiffs argue that DZ Atlantic cannot claim it was reasonable in relying on the address information provided on Plaintiffs' Certificates of Per Diem Eligibility because Plaintiffs have provided evidence that DZ Atlantic supervisors made various misrepresentations concerning per diem eligibility that contributed to Plaintiffs' certification of allegedly misleading address information.[41] As discussed above, many Plaintiffs have testified that DZ Atlantic supervisors misrepresented the requirements and policies underlying the per diem program, and that supervisors allegedly made such statements while also encouraging some Plaintiffs to enroll in the program despite their knowledge or willful ignorance of Plaintiffs' ineligibility of the

---

[41] Whether DZ Atlantic knew that its supervisors were advising Plaintiffs concerning the requirements for per diem eligibility or encouraging Plaintiffs to apply for per diem compensation regardless of their true eligibility presents another unresolved question of fact that would impact whether the company was reasonable in its reliance on Plaintiffs' Certificates of Per Diem Eligibility.

program.  The court finds that Plaintiffs' evidence creates genuine issues of material fact as to whether DZ Atlantic contributed to Plaintiffs' actions in claim eligibility for per diem and whether it was reasonable for DZ Atlantic to rely on the information provided in Plaintiffs' Certificates.  Accordingly, the court denies DZ Atlantic's motion for summary judgment on its promissory estoppel counterclaims.

### C. Conversion

The South Carolina Supreme Court has defined conversion as "the unauthorized assumption in the exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights." *SSI Med. Servs., Inc. v. Cox*, 301 S.C. 493, 498, 392 S.E.2d 789, 792 (1990).  When, as here, money is the subject of the conversion claim, definite sums must be capable of being identified.  *Id.*  DZ Atlantic contends that it is entitled to summary judgment as a matter of law because all Plaintiffs who applied for and received per diem payments by misrepresenting their permanent residences had no right to such payments.

Plaintiffs argue that a genuine issue of material fact exists regarding whether Plaintiffs were authorized[42] to receive the payments. Here again, Plaintiffs testified that DZ Atlantic supervisors misrepresented the requirements for per diem eligibility, misrepresented the purpose of the per diem program, and encouraged Plaintiffs to participate in the per diem program despite their knowledge and/or willful ignorance of Plaintiffs alleged ineligibility for the program.

Because Plaintiffs provided some evidence that DZ Atlantic's supervisors indicated that they were eligible or would be eligible if they provided the requested documents, an issue of fact

---

[42] The court suggests a distinction between being eligible for per diem payments and being authorized to receive per diem payments.  Eligibility is determined by the requirements listed on the Certificate of Per Diem Eligibility, but authorization may arise from other statements or actions, in this case, by DZ Atlantic supervisors.

49

exists as to whether DZ Atlantic supervisors authorized per diem payments to Plaintiffs. Consequently, the court denies summary judgment on DZ Atlantic's counterclaim for conversion.[43]

## CONCLUSION

For the foregoing reasons, the court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment [Dkt. No. 228 in 8:09-cv-02383-JMC; Dkt. No. 169 in 8:09-cv-02942-JMC]. The court grants summary judgment in favor of DZ Atlantic on Plaintiffs' claims but denies summary judgment on DZ Atlantic's counterclaims.

**IT IS SO ORDERED**.


_J. Michelle Childs_

United States District Judge

Greenville, South Carolina
November 14, 2012

---

[43] To be clear, the court notes that the resolution of DZ Atlantic's summary judgment motion on Plaintiffs' claims was largely dependent on the particular claims asserted by Plaintiffs, Plaintiffs' at-will employment status, and the reasonableness of Plaintiffs' reliance on statements by DZ Atlantic supervisors in light of language in the Certificate and the Employee Handbook which required Plaintiffs to complete forms truthfully and to refrain from relying on supervisor's statements advising them to do anything in contravention of company policy. Conversely, the resolution of DZ Atlantic's request for summary judgment on its counterclaims is precluded because there are genuine issues of material fact which must be resolved concerning whether DZ Atlantic's actions amount to an equitable bar to its claims for repayment.